**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: UNASSIGNED**

| | | |
|---|---|---|
| **JPM TUNA,**<br>**Plaintiff,**<br>*v.*<br>**UNITED STATES OF AMERICA**<br>**Defendant.** | : | Case No. 26-04022 |

**COMPLAINT**

Plaintiff JPM Tuna brings this action against the United States and, for its Complaint, alleges as follows:

**INTRODUCTION**

1. This is a protest denial action which seeks to recover duties under section 301 of the Trade Act of 1974 ("Section 301") unlawfully assessed on imported tuna. U.S. Customs and Border Protection ("CBP") redesignated the country of origin of Plaintiff's fresh, headed and gutted Bigeye tuna ("H&G Tuna") from the Republic of the Marshall Islands ("RMI") to the People's Republic of China ("PRC"). CBP then assessed a 25 percent supplemental duty under Section 301 on merchandise that is not, in fact, a product of the PRC. The H&G Tuna was harvested in the RMI's Exclusive Economic Zone ("EEZ") by longline vessels operating under charters registered with the RMI and the Western and Central Pacific Fisheries Commission ("WCPFC") and under RMI's EEZ fishing permits. Its country of origin is therefore the RMI—the place of harvest—under the country-of-origin rules CBP is required to apply to wild-caught fish. CBP's contrary determination rests on a flag-of-the-vessel rule that is applicable only to fish

caught on the "high seas." The RMI exercises jurisdiction over its waters, including its EEZ, and requires fishing vessels operating in its EEZ to submit to RMI jurisdiction. Under U.S. law, the RMI's EEZ is not the "high seas," and the flag-of-the-vessel rule is inapplicable. CBP's determination also relies on non-precedential dicta in *Koru North America v. United States*, 12 C.I.T. 1120 (1988), 701 F. Supp. 229 (1988) ("*Koru*"). CBP's determination is also factually incorrect. CBP treated Plaintiff's entire 16-carton shipment of H&G Tuna as caught by PRC-flag vessels, when in truth only one of the 16 cartons was caught by a PRC-flag vessel and the remaining 15 were caught by a Federated States of Micronesia ("FSM")-flag vessel. Plaintiff timely protested the reliquidation embodying CBP's determination on June 30, 2026, and filed a request for accelerated disposition mailed by certified mail on July 1, 2026. CBP denied the protest under 19 U.S.C. § 1515(a) on July 29, 2026, for reasons left unstated. Plaintiff now timely invokes this Court's jurisdiction under 28 U.S.C. § 1581(a) and seeks reliquidation of the entry free of the Section 301 duties, together with a refund of the excess duties and interest.

## THE PARTIES

2. Plaintiff JPM Tuna is an importer and distributor of tuna, with a place of business at 315 Freeport Street, Apt. 3, Dorchester, Massachusetts 02122-3580, and Importer of Record No. 47-469057300. Plaintiff is the importer of record of the merchandise covered by the entry at issue, is the party that paid the duties and interest at issue, and is the party that filed the protest denied by operation of law.

3. Defendant is the United States. The agency whose decision is contested in this action is CBP, a component of the U.S. Department of Homeland Security.

## JURISDICTION AND STANDING

4. This action contests the denial of a protest under section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1515. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).

5. Plaintiff, as the importer of record, the real party in interest that paid the duties and interest at issue, and the party that filed the protest denied by operation of law, has standing to commence and maintain this action under 28 U.S.C. § 2631(a).

6. The merchandise that is the subject of this action was entered at Port 4601 under Consumption Entry No. E4P-00897686, filed November 16, 2024. CBP reliquidated the entry on January 2, 2026.

7. Plaintiff timely filed Protest No. 460126142110 electronically in the Automated Commercial Environment ("ACE") on June 30, 2026, within 180 days after the date of reliquidation, in accordance with 19 U.S.C. § 1514(c)(3) and 19 C.F.R. pt. 174.

8. By letter dated July 1, 2026, and mailed the same day by certified mail, Plaintiff requested accelerated disposition of Protest No. 460126142110 pursuant to 19 U.S.C. §§ 1514(c)(1) and 1515(b) and 19 C.F.R. § 174.22. CBP denied the protest in whole on July 29, 2026, before the thirtieth day following the date of mailing of that request, so that the protest was denied pursuant to 19 U.S.C. § 1515(a).

9. This action is commenced within 180 days after the date on which the protest was denied by operation of law, as required by 28 U.S.C. § 2636(a).

10. All liquidated duties, charges, and exactions with respect to the entry that is the subject of this action have been paid, as required by 28 U.S.C. § 2637(a).

## THE CONTESTED ADMINISTRATIVE DECISION

11. This action contests CBP's decision, protested in Protest No. 460126142110 and denied by CBP under 19 U.S.C. § 1515(a), to redesignate the country of origin of the imported merchandise from the RMI to the PRC, and to assess supplemental duties on the merchandise under Section 301 and subheading 9903.88.03 of the Harmonized Tariff Schedule of the United States ("HTSUS").

## STATEMENT OF FACTS

12. The merchandise covered by Entry No. E4P-00897686 consists of fresh, H&G Tuna (Thunnus obesus), classified under HTSUS subheading 0302.34.0000 as "Fish, fresh or chilled … Bigeye tuna." The merchandise comprised 16 cartons of H&G Tuna with a total entered value of $13,285.13.

13. The merchandise was harvested by longline catching vessels operating in the RMI's EEZ under charters registered with the RMI and with the WCPFC, and under EEZ fishing permits issued by the RMI. It was landed at Delap Commercial Harbor, Majuro, RMI, and imported into the United States.

14. Upon entry, Plaintiff declared the country of origin of the merchandise to be the RMI—the country in whose EEZ the H&G Tuna was harvested.

15. CBP liquidated the entry "no change" on October 10, 2025.

16. By CBP Form 29 Notice of Action dated December 30, 2025, CBP advised that it had "corrected" the entry to change the country of origin of the H&G Tuna on line 1 to China, stating that, "[b]ased on the vessel information provided from the catch certificate, the tuna entered on line 1 would be considered a product of China and not the Marshall Islands."

17. CBP's redesignation of origin rested on the flag of the harvesting vessel and on *Koru*. *Koru's* conclusion that a nation's EEZ is the "high seas" where the flag-of-the-vessel rule applies is nonprecedential dicta. Moreover, *Koru* erroneously relied on the Law of the Sea Treaty ("LOSC")'s characterization of EEZs to be "high seas" as U.S. law when the LOSC is not U.S. law due to the fact that Congress never approved U.S. accession to the treaty. CBP's blind adherence to *Koru* fails to consider U.S. law mandating CBP's application of a place-of-harvest rule and the Congressional enactment of a U.S. definition of the "high seas" which places the high seas outside the outer boundary of a nation's EEZ, contrary to *Koru's* finding. Therefore, the flag-of-the-vessel rule, which is limited to the high seas, cannot operate to determine the origin of the H&G Tuna caught in the RMI's EEZ.

18. As a result of its redesignation of origin, CBP reliquidated the entry on January 2, 2026, and assessed a 25 percent supplemental duty of $3,321.28, plus interest, on the merchandise under Section 301, implemented through HTSUS subheading 9903.88.03 as applied to products of the PRC classified under subheading 0302.34.0000.

19. CBP's redesignation was erroneous both as a matter of law and as a matter of fact, for the reasons set forth in the Counts below.

## <u>COUNT I</u>

### <u>CBP Was Required to Determine the Country of Origin of the Wild-Caught H&G Tuna as the RMI by Applying a Place-of-Harvest Rule</u>

20. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

21. CBP administers 19 U.S.C. § 1304(a), which requires that articles of foreign origin be marked with their country of origin. Section 1304 does not define "country of origin." CBP's regulation at 19 C.F.R. § 134.1(b) defines "country of origin" as "the country of manufacture,

production, or growth of any article of foreign origin entering the United States." Wild fish are "produced" when caught or harvested.

22. The regulations governing the importation of wild fish establish a place-of-harvest rule for determining country of origin. The Fish and Wildlife Service ("FWS") regulation at 50 C.F.R. § 10.12, promulgated to implement U.S. tariff laws and the Marine Mammal Protection Act of 1972 ("MMPA"), among other statutes, define "country of origin" to mean "the country where the animal was taken from the wild, or the country of natal origin of the animal." *See* 38 Fed. Reg. 22,015, 22,016 (Aug. 15, 1973); 50 C.F.R. § 10.1. CBP's predecessor, the U.S. Customs Service, participated in the review of these regulations. *See* 45 Fed. Reg. 56,668 (Aug. 25, 1980).

23. The FWS regulation defining "country of origin" was promulgated to regulate the importation of wildlife, among other purposes, and establish a uniform origin rule to implement the U.S. tariff laws and the MMPA, among other statutes. *See* 50 C.F.R. § 10.1 (identifying, among the statutes enforced, the Tariff Classification Act of 1962, 19 U.S.C. § 1202); *see also* 19 U.S.C. § 3013 (references to the Tariff Schedules of the United States are treated as references to the HTSUS). The same regulation defines "import," for tariff purposes, to mean "to land on, bring into, or introduce into … any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the tariff laws of the United States." 50 C.F.R. § 10.12. These regulations are enforced by FWS together with CBP. *See* 45 Fed. Reg. 56,668 (Aug. 25, 1980).

24. Congress and other agencies have adhered to the same country-of-harvest rule for wild fish. The Agricultural Marketing Act of 1946, as amended, requires wild fish to be labeled at retail with their country of origin, 7 U.S.C. § 1638a(a), and the implementing regulations establish that the country of origin of wild fish is the place of harvest. *See* 69 Fed. Reg. 59,708, 59,741,

59,743 (Oct. 5, 2004). ("For wild fish harvesters, country of origin and method or production (wild) generally is established at the time that the product is harvested…."). Because 7 U.S.C. § 1638a and 19 U.S.C. § 1304(a) serve the same purpose, they must be construed in *pari materia*.

25. In promulgating the interim final rule implementing the wild fish country-of-origin retail labeling requirement, the Agricultural Marketing Service confirmed that, for wild fish, country of origin and method of production are established at the time the product is harvested, and that the records substantiating an origin claim must identify where the fish was harvested. *See* 69 Fed. Reg. 59,708, 59,741, 59,743 (Oct. 5, 2004).

26. The regulations of the National Oceanic and Atmospheric Administration ("NOAA"), implementing the MMPA, 16 U.S.C. § 1361 *et seq.* ("MMPA"), are to the same effect. NOAA administers the U.S. Seafood Import Monitoring System that establishes reporting and recordkeeping requirements to deter illegal, unreported, and unregulated ("IUU") fishing from U.S. commerce. NOAA's regulation at 50 C.F.R. § 216.3 defines "harvesting nation" as "the country under whose flag one or more fishing vessels are documented, or which has by formal declaration agreed to assert jurisdiction over one or more certified charter vessels, from which vessel(s) fish are caught that are a part of any cargo or shipment of fish to be imported into the United States, regardless of any intervening transshipments."

27. NOAA's regulations further confirm that a nation that assumes responsibility for foreign-flag charter vessels is the country of origin of the fish those vessels catch. A "certified charter vessel" is "a fishing vessel of a non-U.S. flag nation, which is operating under the jurisdiction of the marine mammal laws and regulations of another, harvesting, nation by a formal declaration entered into by mutual agreement of the nations." 50 C.F.R. § 216.3. The RMI has asserted its jurisdiction over non-RMI-flag fishing vessels operating in its EEZ whose charter is

registered with the RMI. *See* Marshall Islands Marine Resources Act of 1988, as amended by the Marshall Islands Resources Act of 1997. By asserting jurisdiction over and registering the charters of the PRC-flag and FSM-flag catching vessels at issue here and issuing their EEZ fishing permits, the RMI accepted responsibility for their fishing operations and is the "harvesting nation" for the H&G Tuna. Consistent with this framework, NOAA's five-year review under the MMPA recognized the RMI's tuna export fishery—comprised of tuna caught in the RMI's EEZ—as comparable in effectiveness to the U.S. regulatory program. *See* NOAA Notice *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products,* 90 Fed. Reg. 42395, 42397 (Sept. 2, 2025) and Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: Marshall Islands.

28. By declining to apply a place-of-harvest rule to the H&G Tuna caught by RMI-registered charter and permitted vessels in the RMI's EEZ, and instead applying a flag-of-the-vessel rule applicable only to the high seas outside the RMI's EEZ, CBP acted contrary to its own regulation and the regulations it enforces on behalf of other agencies responsible for regulating imports of wild fish. Accordingly, CBP's redesignation of the country of origin of the H&G Tuna is contrary to law.

## COUNT II

## The RMI's EEZ Is Not the "High Seas" Under U.S. Law, and the Flag-of-the-Vessel Rule Does Not Apply

29. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

30. Any flag-of-the-vessel rule for wild caught fish applies only to fish caught on the "high seas." The H&G Tuna was not caught on the "high seas;" it was harvested within the RMI's EEZ, which are RMI waters subject to the RMI's national jurisdiction.

31. Congress has defined the "high seas" to exclude the EEZs of nations recognized by the United States. *See* 16 U.S.C. § 5502(3) ("The term 'high seas' means the waters beyond the territorial sea or exclusive economic zone (or the equivalent) of any nation, to the extent that such territorial sea or exclusive economic zone (or the equivalent) is recognized by the United States."). NOAA has promulgated the same "high seas" definition in its regulations governing the fisheries at issue. *See* 50 C.F.R. §§ 300.211, 300.331.

32. The RMI asserts jurisdiction over its EEZ in P.L. 1992-25, section 902(4)(iii), which provides: "Waters of the Republic' shall mean the Internal Waters, Territorial Waters, and Exclusive Economic Zone as defined in the Marine Zones (Declaration) Act 1984. [P.L. 2001-27, § 902]." The RMI has also formally asserted that its "maritime boundaries" include its EEZ and asserted its sovereignty thereover. *See* Republic of Marshall Islands Maritime Zones Declaration Act 2016; and *see* Republic of the Marshall Islands Ministry of Foreign Affairs: Declaration of Baselines and Maritime Zones Outer Limits Made Under Section 118 of the Maritime Zones Declaration Act 2016.

33. The United States, through the Department of State, recognizes the RMI's EEZ and the RMI's exercise of jurisdiction over it. "The Contiguous Zone, EEZ, and Continental Shelf Jurisdiction: Sections 115 and 116 of the *Maritime Zones Declaration Act 2016* describe the Marshall Islands' rights and jurisdiction in the contiguous zone, EEZ, and continental shelf." *See* U.S. Dep't of State, Bureau of Oceans and International Environmental and Scientific Affairs,

Limits in the Seas No. 145, *Republic of the Marshall Islands: Archipelagic and Other Maritime Claims and Boundaries* (Feb. 14, 2020).

34. The United States treats EEZ waters as national waters, not the high seas, in analogous country-of-origin contexts. For purposes of country-of-origin labeling of fish, the Department of Agriculture defines "waters of the United States" as "those fresh and ocean waters contained within the outer limit of the Exclusive Economic Zone (EEZ) of the United States," as described by the Department of State. 7 C.F.R. § 60.132; *see* Dep't of State Public Notice 2237, 60 Fed. Reg. 43,825 (Aug. 23, 1995).

35. The RMI asserts and exercises jurisdiction over fishing within its EEZ. The RMI's permits restrict the catching vessels to the RMI's EEZ and require RMI observers aboard to monitor compliance. The catch of vessels operating under RMI-registered charters is attributed to the RMI under the framework of the South Pacific Tuna Treaty, implemented by the South Pacific Tuna Act of 1988, 16 U.S.C. § 973 *et seq*., which governs fishing in waters within the jurisdiction of a Pacific Island party, and under the WCPFC, which requires each member to register the vessels authorized to fish in its national waters. *See* WCPFC Conservation and Management Measure 2018-06.

36. Because the RMI's EEZ is "recognized by the United States" and is not the "high seas" under U.S. law, the flag-of-the-vessel rule is inapplicable to determine the origin of the H&G Tuna harvested there. CBP's application of that rule is contrary to law.

## COUNT III

## CBP's Reliance on *Koru* Is Contrary to Law

37. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

38. CBP's redesignation relies on *Koru*. The holding of *Koru* was that hoki fish caught in New Zealand's EEZ and processed in the Republic of Korea (*i.e.,* by thawing, skinning, boning, trimming, glazing, refreezing, and packaging) was substantially transformed into a product of Korea. Given that holding, the *Koru* Court had no need to decide the country of origin of the fish as caught, and its statements characterizing an EEZ as the "high seas" and applying a flag-of-the-vessel rule are non-precedential *dicta* (and glaringly incorrect).

39. The *Koru dicta* rested on the definition of the "high seas" in the LOSC, opened for signature Dec. 10, 1982, 1833 U.N.T.S. 397. The United States has signed but never ratified the LOSC, and the Senate has never given its advice and consent to accession. The LOSC is therefore not United States law and does not determine whether a coastal nation's EEZ is the "high seas" for purposes of U.S. origin rules.

40. Under Article II, Section 2 of the United States Constitution, a treaty becomes the law of the United States only when ratified with the advice and consent of the Senate. Because the United States signed but never ratified the LOSC, the LOSC's definition of the "high seas" is not United States law and cannot supply the rule of decision that the *Koru dicta* drew from it.

41. The *Koru* Court did not consider the FWS country-of-origin regulation or the subsequent statutory and regulatory developments described in Counts I and II, including the enactment of 16 U.S.C. § 5502(3). CBP's reliance on non-precedential *dicta* in *Koru*, to the exclusion of the governing statutes and regulations, is contrary to law.

42. U.S. law asks whether a coastal nation exercises jurisdiction over its EEZ, not whether it asserts sovereignty over those waters. The RMI's exercise of jurisdiction over its EEZ—recognized by the United States—establishes the RMI as the country of origin of fish harvested there. CBP's contrary position has no support in U.S. law.

**COUNT IV**

**CBP Erred as a Matter of Fact as to the Flag of the Harvesting Vessels and Over-Assessed Section 301 Duties**

43. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs.

44. Even if a flag-of-the-vessel rule applied—which it does not—CBP's assessment would remain erroneous because CBP misidentified the flag of the vessel that harvested nearly all of the merchandise. The catch and landing certificate accompanying the shipment contained an inadvertent typographical error identifying a harvesting vessel as "SLC 723" when the correct vessel was "CFA 23," an FSM-flag vessel. The error was confirmed by a written declaration of typographical error from Marshall Islands Fishing Venture, Inc. dated June 28, 2026.

45. Of the 16 cartons of H&G Tuna covered by the entry, only one carton—carton No. 3509, weighing 146.12 pounds and having a commercial invoice value of $1,329.69—was harvested by a PRC-flag vessel, the Shen Lian Cheng 784 ("SLC784"). The remaining 15 cartons, weighing 1,389.27 pounds and having a commercial invoice value of $11,955.44, were harvested by the FSM-flag vessel CFA-23.

46. CBP nevertheless assessed Section 301 duties applicable to products of the PRC on the entire line, including the 15 cartons of H&G Tuna harvested by an FSM-flag vessel. Even under CBP's own (erroneous) legal theory, no more than carton No. 3509 could be treated as a product of the PRC. CBP's assessment of Section 301 duties on the FSM-harvested tuna is unsupported by the facts and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Enter judgment that the country of origin of the H&G Tuna covered by Entry No. E4P-00897686 is the RMI, and that the merchandise is not subject to the Section 301 duties applicable to products of the PRC under HTSUS subheading 9903.88.03;

B. In the alternative, enter judgment that at least the 15 cartons of H&G Tuna harvested by the FSM-flag vessel CFA-23 are not products of the PRC and are not subject to the Section 301 duties under HTSUS subheading 9903.88.03;

C. Order CBP to reliquidate the entry consistent with the Court's judgment, without assessment of the Section 301 duties under HTSUS subheading 9903.88.03;

D. Order the refund of all excess duties, together with all interest and other charges assessed thereon, with interest as provided by law;

E. Award Plaintiff its costs and such other and further relief as the Court deems just and proper.

* * *

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff JPM Tuna*

/s/ Michael K. Tomenga
Michael K. Tomenga
NEVILLE PETERSON LLP
1301 L Street, N.W., Ste. 300
Washington, D.C. 20005-4870
(202) 776-1148
mtomenga@npwdc.com

/s/ Richard F. O'Neill
Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
NEVILLE PETERSON LLP
One Exchange Plaza at 55 Broadway
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: September 17, 2026